FILED

2021 Nov-17  PM 02:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **RADIAH FLETCHER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | Civil Action Number |
| **v.** ) | **5:21-CV-01431-AKK** |
| ) | |
| **CITY OF MADISON, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

Radiah Fletcher, proceeding *pro se*, sues the City of Madison; Mayor Paul Finley; Madison Police Department Chief Johnny Gandy; and the individual members of the Madison City Council, Maura Wroblewski, Connie Spears, Teddy Powell, Greg Shaw, Ranae Bartlett, Karen Denzine, and John Seifert. Docs. 1; 4. Fletcher asks the court to declare that (1) certain City law-enforcement practices are unconstitutional; (2) during future consensual encounters between Fletcher and City police officers, the officers will not force Fletcher to comply with requests and will terminate the encounters if Fletcher does not comply or will state facts constituting reasonable suspicion; and (3) the defendants must provide certain training to City police officers. *See* doc. 1 at 16–17.[1] Upon review of Fletcher's initial complaint,

---

[1] Although the amended complaint describes the sought relief somewhat differently, the thrust of the requested relief remains the same: Fletcher seeks a declaration that the defendants' policies and practices violate the Fourth and Fourteenth Amendments, that the defendants must provide

the court expressed doubt that Fletcher had standing to pursue this relief and gave her an opportunity to cure this deficiency, if possible. *See* doc. 3. Fletcher thereafter filed an amended complaint attempting to specify the threat of injury to herself. *See* doc. 4 at 8–10. Fletcher also seeks to proceed *in forma pauperis*. Doc. 2.

Fletcher's motion to proceed *in forma pauperis*, *id.*, is due to be granted. However, for the reasons expressed more fully below, the court believes that the amended complaint, doc. 4, is still due to be dismissed without prejudice because Fletcher lacks standing.

## I.

The court holds *pro se* pleadings such as this one to a less stringent standard than those drafted by attorneys and construes *pro se* pleadings liberally. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). In a declaratory judgment action, generally the court reviews the complaint to determine whether it states a plausible claim to declaratory relief. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). The court's inquiry must begin with the question of standing, for if Fletcher lacks standing, the inquiry must end there, too. *See A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

---

specific training to City police officers, and that City police officers must articulate reasonable suspicion before attempting to force Fletcher to comply with police orders. *See* doc. 4 at 13–14.

Article III of the U.S. Constitution "limits federal courts to adjudicating actual 'cases' and 'controversies.'" *Id.*; *see* U.S. CONST. art. III, § 2. The "case-or-controversy" requirement, also known as standing, may be raised at any stage of a case, even by the court. *See A&M Gerber*, 925 F.3d at 1210 (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). Standing refers to whether a litigant has a sufficiently "personal stake" in the outcome of a case so as to assure "concrete adverseness" and to allow the court to properly resolve the dispute on the merits. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1264 (11th Cir. 2015).

To establish standing, a litigant must plead some concrete, particularized, and actual or imminent injury fairly traceable to the defendant's conduct and substantially likely to be redressed by the requested relief. *Id.*; *Women's Emergency Network v. Bush*, 323 F.3d 937, 943 (11th Cir. 2003) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The controversy "cannot be 'conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury'" that can be resolved by the court's intervention. *See A&M Gerber*, 925 F.3d at 1210. "Absent a redressable injury, a judicial determination of a plaintiff's claim would amount to an advisory opinion prohibited by Article III's case and controversy requirement." *Church v. City of Huntsville*, 30 F.3d 1332, 1335 (11th Cir. 1994).

3

## II.

This case centers on the right to decline to engage with law enforcement during consensual encounters with police officers.  *See* doc. 4 at ¶ 13.[2]  Fletcher contends that the defendants have failed to implement within the City police department "the policies, procedures, training, and rules" necessary to protect individuals "from unconstitutional coercion, harm, and/or death when they lawfully refuse to cooperate or comply with police 'commands' during consensual encounters."  *Id.* ¶ 12.  In support of this contention, Fletcher cites four fatal or violent encounters between individuals and City police officers that occurred over the last seven years.  *Id.* ¶ 14.

Fletcher first pleads that on February 6, 2015, Officer Eric Parker approached Sureshbhai Patel, "a 57-year-old, frail Indian grandfather," while Patel walked through a City neighborhood.  *Id.* ¶ 15.  After Patel, who did not speak English, did not follow the officer's commands, Officer Parker engaged in a "dangerous leg-sweep" that brought Patel to the ground and left him permanently paralyzed.  *Id.* ¶ 17.  Fletcher states that the City "disciplined" Officer Parker but "failed to implement effective rules to ensure that its police officers did not continue to inflict

---

[2] The court derives the factual allegations from the amended complaint, doc. 4, and construes them in the light most favorable to Fletcher.

crippling injuries upon other citizens whom officers may deem noncompliant during consensual encounters." *Id.* ¶ 19.

Fletcher next cites a series of violent encounters that occurred on October 27, 2019 between City police officers, Dana Fletcher, and members of Dana Fletcher's family. *Id.* ¶¶ 20–26.  Fletcher states that three City police officers "harassed, brutalized, and killed" Dana Fletcher, a 39-year-old man of color, after observing him in the passenger seat of a parked vehicle while he waited for a family member. *Id.* ¶ 20.  Fletcher asserts that Dana Fletcher chose not to engage with the officer who initiated contact with him and that, "[l]ike Officer Parker, this unidentified officer set off a series of unlawful measures to coerce [Dana] Fletcher's compliance that ended in irreversible damage—in this case, death." *Id.* ¶ 22.  Fletcher pleads that an unidentified City police officer also threatened Cherelle Fletcher, a then-31-year-old woman of color, broke her car window, unlocked the door, and pulled her outside. *Id.* ¶ 24.  Fletcher further states that City police officers pulled V.F., a then-8-year-old girl of color, out of the vehicle and onto broken glass, where she witnessed her father's death. *Id.* ¶ 25.  Upon review, the City allegedly maintained that all aspects of its officers' engagement with and use of force against Dana Fletcher, Cherelle Fletcher, and V.F. "were consistent with department policies and/or procedures." *Id.* ¶¶ 23, 26.  Far from disciplining the officers involved, the

City purportedly shielded their identities from the public and awarded them medals. *Id.* ¶¶ 31, 33.

In light of these tragic events and the City's responses, Fletcher contends that the defendants' "leadership . . . is strengthening a culture within MPD that emboldens officers to disregard citizens' right of noncompliance during consensual encounters, and that makes future violations more likely." *Id.* ¶ 33. As to herself personally, Fletcher pleads that she engages in daily life in and around the City and participates in protests in the City related to the killing of Dana Fletcher, the assaults of Cherelle Fletcher and V.F., and the defendants' "subsequent attempts to avoid transparency with respect to those encounters." *See id.* ¶¶ 34–35. Fletcher alleges that though she "has no history of violent or criminal behavior" and "no history of instigating unprovoked (or even provoked) violent encounters with others," she has "an excitable personality" and "talks loudly, fast, and in a high-pitched, agitated, and argumentative-sounding voice when she is stressed or scared." *Id.* ¶ 37. Fletcher asserts that the culture the defendants have allowed to take root within the City police department would permit officers to view Fletcher's conduct "as threats that would justify their decision to use extreme and perhaps deadly force, even during an encounter that a reasonable person would consider consensual." *Id.* ¶ 38.

Fletcher essentially states that she will exercise her right not to comply during consensual encounters with City police officers but that this decision could pose

grave danger. *Id.* ¶¶ 39–40.  Fletcher asserts that she "has a legitimate expectation of being able to decide for herself whether to cooperate with or to terminate a consensual encounter" with City police officers but that the defendants' policies and practices effectively nullify this right. *See id.* ¶¶ 44–45.  Finally, Fletcher states that "[b]ecause of how consensual encounters arise—often suddenly and without warning from the standpoint of the citizen who has done nothing criminal to justify the encounter but who also can do little to prevent such encounters from occurring," the defendants' policies and practices pose a "credible threat" to Fletcher each time she "goes about her lawful activities of daily life" around the City.  *Id.* ¶ 47.

Fletcher thus asks the court to issue declarations stating that:

- [the] [d]efendants' policies, procedures, practices, and/or customs violate the Fourth and Fourteenth Amendments to the United States Constitution to the extent that they authorize [the] [d]efendants' officers to use force or threat of force to compel compliance with officer commands during a consensual encounter;

- [the] [d]efendants' use of internal policies, procedures, and practices to deprive [Fletcher] of her Fourth Amendment 'consensual encounter rights' and to subject them to officers' discretion is both ineffective and violative of the due process clause of the United States Constitution;

- [the] [d]efendants must remediate the dangerous conditions and legal uncertainties that they have created as a result of their constitutionally offensive policies, procedures, and practices; and that effective remediation requires the adoption and implementation of training, policies, procedures, and practices that protect and preserve citizens' right not to comply during consensual encounters.

*Id.* at 13–14.

# III.

Fletcher seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. *See* doc. 4 at 2, 13–14.[3]  This statute provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  To satisfy Article III's standing requirements for declaratory relief, Fletcher must "allege facts from which it appears that there is a 'substantial likelihood that [she] will suffer injury in the future.'"  *See A&M Gerber*, 925 F.3d at 1210–11 (quoting *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999)).  Put another way, because declaratory relief "is by its nature prospective," Fletcher must establish "a sufficient likelihood" that the defendants' alleged conduct will harm her in the future.  *See McGee v. Solicitor Gen. of Richmond Cty.*, 727 F.3d 1322, 1325 (11th Cir. 2013); *Church*, 30 F.3d at 1337. "The remote possibility that a future injury may happen is not sufficient to satisfy the 'actual controversy requirement' for declaratory judgments."  *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985).  And although past wrongs "are evidence bearing on whether there is a real and immediate threat of repeated injury, past

---

[3] Fletcher also asks the court to grant her "any other relief" to which she may be entitled.  Doc. 4 at 2, 13.  *See also* 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.").

exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Church*, 30 F.3d at 1337.

### A.

Upon a review of the case law, and on the facts alleged, the court concludes that precedent shuts the door to standing in Fletcher's case. The facts of this case echo in important ways the facts of three Supreme Court cases governing a litigant's standing to address concerns or fears related to past police misconduct: *Rizzo v. Goode*, 423 U.S. 362 (1976); *Ashcroft v. Mattis*, 431 U.S. 171 (1977); and *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

### 1.

In *Rizzo*, the Supreme Court held that the plaintiffs lacked standing to seek equitable relief that included appointing a receiver to supervise the Philadelphia police department, revising police manuals, and improving the processing of complaints against officers. 423 U.S. at 369, 372–73. The plaintiffs had sued the City of Philadelphia, its mayor, and other municipal and police officials based on a pattern of unconstitutional mistreatment by police officers of Philadelphia residents, particularly residents of color. *Id.* at 366–67. The plaintiffs produced evidence indicating that Philadelphia police officers unlawfully entered homes, charged and beat individuals during unlawful arrests, overreacted to actual or reported assaults

upon officers, and mistreated those who questioned or criticized police activity. *See Goode v. Rizzo*, 506 F.2d 542, 544 (3d Cir. 1974).

Reviewing testimony encompassing more than 35 incidents of purported misconduct, the district court concluded that while misconduct "[was] attributable to only a small percentage of the members of the police force," the violations "[took] place with such frequency" that they could not be "dismissed as rare isolated instances." *Id.* at 545 (citing *Council of Org. on Philadelphia Police Accountability & Responsibility v. Rizzo*, 357 F. Supp. 1289, 1319 (E.D. Pa. 1973)). In addition, the district court found that "little or nothing" was done by city officials to discipline or prevent this conduct. *Id.* The Supreme Court, however, determined that the plaintiffs' "claim to 'real and immediate' injury" rested upon "what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures." *Rizzo*, 423 U.S. at 372. The Court deemed this too "attenuated" to invoke federal jurisdiction, meaning that the plaintiffs did not have a "sufficiently personal stake in the outcome" of the case to establish standing to seek the requested relief. *Id.* at 373.

2.

In *Mattis*, the Supreme Court determined that the plaintiff did not have standing to obtain a judgment declaring unconstitutional Missouri statutes that authorized police officers to use deadly force to apprehend individuals committing

felonies. 431 U.S. at 171–72. The plaintiff had sued several Missouri police officers who shot and killed his son during an arrest. *Id.* at 171. Seeking damages and declaratory relief, the plaintiff alleged that he had another son who, "if ever arrested or brought under an attempt at arrest on suspicion of a felony, might flee or give the appearance of fleeing, and would therefore be in danger of being killed by these defendants or other police officers." *Id.* at 172 n.2. The Court deemed this "speculation" insufficient to establish a "present, live controversy." *Id.* As to the plaintiff's "present interest in . . . obtain[ing] emotional satisfaction from a ruling that his son's death was wrongful," the Court held that the plaintiff's "[e]motional involvement" could not establish standing. *Id.* at 173.

3.

Finally, in *Lyons*, the Supreme Court concluded that the plaintiff, whom Los Angeles police officers placed in a chokehold during a traffic stop, lacked standing to seek an injunction limiting Los Angeles police officers' future use of chokeholds and a judgment declaring that the use of chokeholds violated various constitutional rights.[4] 461 U.S. at 98, 101. Despite evidence indicating the continued use of chokeholds by the Los Angeles Police Department in the years between the filing of

---

[4] Specifically, the plaintiff sought an injunction barring officers' use of chokeholds except where proposed victims "reasonably appear[ed] to be threatening the immediate use of deadly force" and a declaratory judgment "that use of the chokeholds absent the threat of immediate use of deadly force [was] a *per se* violation of various constitutional rights." *Lyons*, 461 U.S. at 98.

11

the complaint and the Court's decision, the Court held that the plaintiff's past chokehold, while a potential basis for damages under 42 U.S.C. § 1983, could not provide a basis for forward-looking relief. *See id.* at 100, 108–09. The Court reasoned that, "[a]bsent a sufficient likelihood that [the plaintiff would] again be wronged in a similar way," the plaintiff "[was] no more entitled to an injunction than any other citizen of Los Angeles." *Id.* at 111. The Court concluded that "a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id.* In a sharply worded dissent joined by Justices Brennan, Blackmun, and Stevens, Justice Marshall criticized the majority in *Lyons* for permitting the City of Los Angeles to continue a flagrantly unconstitutional policy indefinitely "as long as it [was] willing to pay damages for the injuries and deaths that result[ed]." *Id.* at 113.[5]

## B.

Here, as a general background for her claims, Fletcher pleads instances involving other citizens who experienced violence, in one case, fatally, at the hands

---

[5] Justice Marshall noted that between 1975 and 1983, Los Angeles police officers choked and killed at least 16 individuals, 12 of whom were African American men. *Id.* at 115–16. Given the plaintiff's past injury and his alleged risk of future injury, both linked to the chokehold policy, Justice Marshall would have found that the plaintiff had standing to seek any kind of relief, prospective or otherwise. *See id.* at 128–29. He concluded that "[t]he Court's decision remove[d] an entire class of constitutional violations from the equitable powers of a federal court" and "immunize[d] from prospective equitable relief any policy that authorize[d] persistent deprivations of constitutional rights as long as no individual [could] establish with substantial certainty that [they would] be injured, or injured again, in the future." *Id.* at 137.

of City police officers during seemingly consensual encounters.  *See* doc. 4 at ¶¶ 14–

27.  As to herself, she pleads that she routinely travels throughout the City and has

participated in protests there, apparently without any interactions with the City's

officers.  *See id.* ¶¶ 34–35.  Indeed, Fletcher does not allege past unconstitutional

conduct of the City's police officers with respect to her own encounters with them.

Rather, because the City apparently has not rectified the issues with its police

department through disciplinary measures or training programs, Fletcher asserts that

the defendants enable an atmosphere of unconstitutional law-enforcement conduct

that violates her right to refuse to comply with City police officers during consensual

encounters.  *See id.* ¶¶ 41, 45–46.  Based on how she may react during any such

potential encounters, Fletcher alleges that the exercise of this right will gravely harm

her in the future.  *See id.* ¶¶ 38–40, 47.  She thus seeks equitable relief declaring

certain City police department policies, procedures, and practices unconstitutional;

instructing City police officers how to engage with her in future encounters; and

mandating a training program so that City police officers know how to disengage

upon a subject's demonstration of noncompliance during a consensual encounter.

*Id.* at 13–14.

        Unfortunately, these allegations do not provide Fletcher standing to obtain the

declaratory relief she seeks.  Binding case law requires Fletcher to provide specific

facts relevant to herself that illustrate a substantial likelihood that she will come into

13

contact with City police officers in the future and suffer injury after wielding her right not to engage with them. *See, e.g.*, *Church*, 30 F.3d at 1338–39 (holding that homeless plaintiffs had standing to challenge municipal policy where homeless residents had suffered arrests and harassment, continued to be arrested and harassed, and could not avoid future exposure to this conduct because their homelessness was involuntary). The amended complaint does not demonstrate that City police officers have limited Fletcher's daily life or protest activities or that there is a substantial likelihood officers will do so in the future on the basis of her declination of their consensual approaches. Though Fletcher asserts that consensual encounters arise "often suddenly and without warning," doc. 4 at ¶ 47, this does not establish that she personally has standing to seek declaratory relief.

## C.

The law presents a maddening catch-22 for many would-be plaintiffs seeking accountability and reform. Because the law often will not react to speculation or predictions about certain future police misconduct, the law effectively instructs plaintiffs to "come back later" when they have more evidence of the likelihood of harm against them. But, as Fletcher insinuates, later may be too late.[6] Still, even

---

[6] In the words of Justice Marshall, the law demonstrates that "wrath and outrage cannot be translated into an order to cease the unconstitutional practice, but only an award of damages to those who are victimized by the practice and live to sue and to the survivors of those who are not so fortunate." *Lyons*, 461 U.S. at 1684 (Marshall, J., dissenting).

when there are horrific abuses of other citizens in the same area, courts may not insert themselves into the governance of police departments based on a citizen's fear about how interactions with officers may end.  In that respect, speculation about Fletcher's potential encounters with the City's police is not sufficient for her claims to go forward.  Because standing "in no way depends on the merits of [Fletcher's] contention that particular conduct is illegal," *see Church*, 30 F.3d at 1336, dismissal here is not an indication that the court agrees or disagrees with Fletcher that the City's alleged conduct is unconstitutional.  The court states only that in the absence of allegations of some concrete future injury or past police encounters demonstrating a substantial likelihood of such injury, Fletcher is asking this court to do what it cannot.[7]

## III.

To close, despite Fletcher's allegations of her well-founded fears of violent police encounters, Fletcher has not established a substantial likelihood of injury to herself by City police officers under binding standing jurisprudence.  As a result, the court cannot issue the relief she seeks.  Although Fletcher's motion to proceed *in*

---

[7] The Supreme Court has recently reminded federal courts that they may not issue advisory opinions or adjudicate hypothetical disputes.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

*forma pauperis*, doc. 2, is due to be granted, the court will dismiss this case without prejudice for lack of standing by separate order.  *See* 28 U.S.C. § 1915(e)(2).[8]

**DONE** the 17th day of November, 2021.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE

---

[8] Section 1915 provides that, "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid," the court "shall dismiss the case at any time" if it determines that the action "fails to state a claim on which relief may be granted."  28 U.S.C. 1915(e)(2).